J-S18045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: K.R., A/K/A K.N.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.O., A/K/A T.R., MOTHER | |
| | No. 2733 EDA 2014 |

Appeal from the Decree June 12, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000259-2014
CP-51-DP-0002033-2011
FID: 51-FN-003917-2011

| | |
|---|---|
| IN THE INTEREST OF: B.R., A/K/A B.D.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.O., A/K/A T.R., MOTHER | |
| | No. 2734 EDA 2014 |

Appeal from the Decree June 12, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000257-2014
CP-51-DP-0002034-2011
FID: 51-FN-003917-2011

J-S18045-15

| | |
|---|---|
| IN THE INTEREST OF: K.R., JR., A/K/A K.M.R., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.O., A/K/A T.R., MOTHER | |
| | No. 2735 EDA 2014 |

Appeal from the Decree June 12, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000258-2014
CP-51-DP-0002035-2011
FID: 51-FN-003917-2011

| | |
|---|---|
| IN THE INTEREST OF: H.R., A/K/A H.T.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.O., A/K/A T.R., MOTHER | |
| | No. 2736 EDA 2014 |

Appeal from the Decree June 12, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000254-2014
CP-51-DP-0002036-2011
FID: 51-FN-003917-2011

| | |
|---|---|
| IN THE INTEREST OF: M.R., A/K/A M.E.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |

- 2 -

J-S18045-15

APPEAL OF: T.A.O., A/K/A T.R.

No. 2737 EDA 2014

Appeal from the Decree June 12, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000255-2014
CP-51-DP-0002037-2011
FID: 51-FN-003917-2011

IN THE INTEREST OF: E.R., A/K/A E.L.R., A MINOR

IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: T.A.O., A/K/A T.R., MOTHER

No. 2738 EDA 2014

Appeal from the Decree June 12, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000256-2014
CP-51-DP-0002038-2011
FID: 51-FN-003917-2011

BEFORE: BENDER, P.J.E., ALLEN, J., and MUNDY, J.

MEMORANDUM BY MUNDY, J.:                                              **FILED JUNE 22, 2015**

Appellant, T.A.O. a/k/a T.R. (Mother), appeals from the June 12, 2014 decrees involuntarily terminating her parental rights and the contemporaneous orders changing the permanency goal to adoption with respect to her six children, K.R., a/k/a K.N.R., a female, born in January 2002; B.R., a/k/a B.D.R., a female, born in November 2002; K.R., Jr., a/k/a K.M.R., Jr., a male, born in June 2004; H.R., a/k/a H.T.R., a female, born in

- 3 -

September 2007, and twins, M.R., a/k/a M.E.R., a male, and E.R., a/k/a E.L.R., a female, born in March 2006 (collectively, the Children).[1]  After careful review, we affirm.[2]

We summarize the relevant facts and procedural history as follows. The Philadelphia Department of Human Services, Children and Youth Division (DHS), first became involved with this family in April 2011, upon receiving a report alleging that B.R., the second oldest child, had missed over 40 days of school during the 2010-2011 school year and suffered from repeated head lice infestation.  N.T., 6/12/14, at 15.  Upon investigation, DHS found that all of the Children had head lice.  *Id.*  Further, DHS found that the Children slept in the same bed.  *Id.*  In addition, DHS found the home was dirty, Mother and Father were behind in utility payments, and a history of domestic violence existed between Mother and Father.  *Id.* at 16-17.

On November 7, 2011, the Children were adjudicated dependent, and they were placed under DHS supervision.  Trial Court Opinion, 10/24/14, at 2.  On January 24, 2012, the trial court placed the Children in foster care

---

[1] By separate decrees, the trial court involuntarily terminated the parental rights of K.M.R., a/k/a K.R. (Father), to the Children.  Father did not file notices of appeal.

[2] At the conclusion of the subject hearing, the guardian *ad litem* (GAL) recommended to the trial court that Mother's parental rights be involuntarily terminated.  N.T., 6/12/14, at 111-112.  The GAL also filed a brief in this matter in support of the decrees involuntarily terminating Mother's parental rights.

following a permanency review hearing that revealed the Children continued to suffer from head lice, and the gas had been turned off in Mother's and Father's home.[3]  N.T., 6/12/14, at 18.

DHS established Family Service Plan (FSP) objectives for Mother that included attending and completing parenting classes, obtaining employment, and obtaining a mental health evaluation.  *Id.* at 19.  The trial court further summarized Mother's objectives at the time of the Children's placement as follows.

> Mother was referred to the Behavioral Health System ("BHS") for appropriate intervention and was ordered to continue domestic violence counseling, parenting classes and budgeting training, follow up on [the] Children['s] medical appointments, provide DHS with copies of household bills, and contact Philadelphia Gas Works regarding a past due balance.

Trial Court Opinion, 10/24/14, at 2.

Thereafter, the trial court held permanency review hearings every 90 days, which we review in relevant part.  At the hearing on April 24, 2012, the trial court ordered Mother to have four unsupervised community weekend visits with the Children, and, at the completion of the school year, two unsupervised visits per week.  *Id.*  In addition, "Mother was referred to the Achieving Reunification Center ("ARC"), the Clinical Evaluation Center

_____

[3] In February 2012, the Elwynn foster care agency placed the Children together in the same foster home where they remained at the time of the termination hearing.  N.T., 6/12/14, at 19.

("CEU"), and ordered to participate in couples counseling, parenting classes, domestic violence training, BHS services, as well as submit bills to DHS." *Id.*

At the hearing on October 23, 2012, the trial court found that Mother had tested positive for marijuana, benzodiazepines, and cocaine. *Id.* As such, DHS added a FSP objective to participate in a drug and alcohol program. N.T., 6/12/14, at 25-26.

At the permanency review hearing on January 11, 2013, the trial court decreased Mother's visitation to supervised visits at the agency because the Children had returned from an overnight visit with colds, scabies, and bug bites. Trial Court Opinion, 10/24/14, at 2. Further, the trial court directed Mother to participate in the Children's treatment at the Children Crisis Treatment Center (CCTC). *Id.*

At the permanency review hearing on April 17, 2013, the trial court directed Mother to verify that there was no bug infestation in her home. *Id.* at 3. At the permanency hearing on July 11, 2013, the trial court again referred Mother to BHS and to the CEU for a drug screen. *Id.* At the final permanency hearing on January 15, 2014, the trial court found Mother minimally compliant with her FSP objectives. *Id.*

On May 28, 2014, DHS filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On the same date, DHS filed petitions for

a goal change to adoption. A combined involuntary termination and goal change hearing occurred on June 12, 2014, during which DHS presented the testimony of caseworkers, Cynthia Rogers-Robinson and Mia Hill. In addition, DHS presented the testimony of Vernon Price, the Elwynn foster care agency caseworker who supervised visits between Mother and the Children. Further, DHS presented the testimony of the CCTC workers, Kelly Casper, Mary Abboud, and Erica Zucker, who provided trauma focused therapy for all of the Children except B.R.[4] Although Mother and her counsel were present for the hearing, Mother did not present any testimonial or documentary evidence.

On June 12, 2014, the trial court entered decrees involuntarily terminating Mother's parental rights to the Children. By permanency orders the same date, the trial court changed the Children's goal to adoption. On July 11, 2014, Mother filed one notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). On August 8, 2014, this Court quashed the appeal without prejudice to Mother's right to seek *nunc pro tunc* appeals as to each separate decree and order. ***See Sulkava v. Glaston Finland Oy***, 54 A.3d 884, 888 (Pa. Super. 2012) (as a general rule, taking one appeal from

---

[4] The record reveals that B.R. is autistic and receives treatment at the Center for Autism. N.T., 6/12/14, at 80-81.

separate judgments is not acceptable practice and is discouraged), *appeal denied*, 75 A.3d 1282 (Pa. 2013).

On August 15, 2014, Mother filed a petition for leave to file an appeal *nunc pro tunc*, which the trial court granted on September 16, 2014. On September 19, 2014, Mother filed separate notices of appeal and concise statements of errors complained on appeal from the decrees and the goal change orders, which this Court consolidated *sua sponte*.[5] The trial court issued its Rule 1925(a) opinion on October 24, 2014.

On appeal, Mother presents the following issues for our review.

> [1]. Whether the [trial ]court erred in failing to find that for the six months immediately preceding the filing of the petition, [M]other was regularly visiting and contacting her children and in regular contact with DHS and that her children were bonded to her, and that [M]other did not intend to relinquish her claim to her children or refused or failed to perform parental duties[?]
>
> 2. Whether the [trial] court erred in finding that there were repeated and continuing findings of incapacity, abuse, neglect and/or dependency of the minor children by [M]other, when [M]other was regularly visiting and contacting her children and in regular contact with DHS, which had approved

---

[5] We note that Mother did not preserve a challenge to the goal change orders in her Rule 1925(a)(2)(i) statement; thus, to the extent Mother argues that the trial court erred with respect to changing the Children's permanency goal to adoption, her claim is waived on appeal. **See Dietrich v. Dietrich**, 923 A.2d 461, 463 (Pa. Super. 2007) (stating that when an appellant filed a Rule 1925(b) statement, any issues not raised in that statement are waived on appeal).

overnight visits and that her children were bonded with her[?]

3. Whether the [trial] court erred in finding that the conditions which led to the removal or placement of the children continue to exist, when [M]other was regularly visiting and contacting her children and in regular contact with DHS, which had approved overnight visits, when her children were bonded with her, when [M]other had completed domestic violence counseling, and when DHS did not help [M]other, when replacement of her housing became an issue[?]

4. Whether the [trial] court erred in finding that the conditions which led to the removal or placement of the children continue to exist and that termination of parental rights would best serve the needs and welfare of the children, when [M]other was regularly visiting and contacting her children and in regular contact with DHS, which had approved overnight visits, when her children were bonded with her, when [M]other had completed domestic violence counseling, and when DHS did not help [M]other, when replacement of her housing became an issue[?]

5. Whether the [trial] court erred in finding that DHS made[] reasonable efforts towards reunification, by either failing and/or refusing to arrange for regular visits and/or contact with [M]other or to consider members of her family as resources or to place the children in the custody of members of her family, or by failing to consider temporary legal custody or permanent legal custody of the children with [M]other's family or resources[?]

6. Whether the [trial] court erred in finding that DHS made, or did not have to make, reasonable efforts towards reunification, by either failing and/or refusing to consider options other than terminating [M]other's parental rights while she was still trying to address her mental health issues, which DHS did not recognize as an issue in a timely manner[?]

7. Whether the [trial] court erred in terminating the rights of [M]other, when the sole reason she was unable to provide housing, provide income, clothing and medical care for the care and maintenance of the children, was that her mental health issues hadn't been recognized or addressed in a timely manner[?]

8. Whether the [trial] court erred in terminating the rights of [M]other, when her children were bonded with her[?]

Mother's Brief at 3-4.

We consider Mother's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, we conclude the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows.

### § 2511. Grounds for involuntary termination

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential

- 11 -

parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or

refusal cannot or will not be remedied." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination [of parental rights under Section 2511(a)(2),] due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Mother argues that the trial court erred in involuntarily terminating her parental rights pursuant to Section 2511(a)(2) because she "has made and continues to maintain communication and contact with and to play a role in

her children's lives and has a bond with her children." Mother's Brief at 12. Further, Mother argues that she completed her FSP objectives. Mother also asserts that she "has shown continued positive intent in establishing a home for her and her children and assuming her parental responsibilities." ***Id.***

In its Rule 1925(a) opinion, the trial court explained its decision to involuntarily terminate Mother's parental rights under Section 2511(a)(2) as follows.

> Mother's poor home conditions, Children's truancy and head lice concerns, led the court to adjudicate and commit the Children to DHS supervision in November, 2011. Two months later, on January 20, 2012, the same unsolved precarious conditions led the court to place the Children in foster care and fully commit the Children to DHS. Throughout the twenty-eight months since the Children have been removed from Mother's care, Mother has not provided DHS with documents verifying the eradication of the lice infestation. Additionally, Mother's mental health became an FSP objective after Mother admitted to a major depression episode. In early 2013, Mother tested positive for cocaine, marijuana and benzoids. From that time forward, drug dependency and mental health were then included in Mother's FSP objectives. Mother has never enrolled in a drug and alcohol program. Mother has been referred to the Clinical Evaluation Unit for drug screen and assessment. Mother was ordered to do random drug screens but she has never availed herself. On January 15, 2014, Mother was still testing positive for cocaine and benzoids. Mother also has never enrolled in a mental health treatment program.
>
> Domestic violence became an FSP objective for Mother due to her admission of violence in the home. Again, Mother has never completed the objective throughout the life of the case. Due to the domestic

> violence at home, the Children's psychological traumas have been treated at CCTC. Mother's participation and attendance was determined to be crucial for the Children's recovery. Nonetheless, Mother has not attended the Children's therapy. Budgeting skills still also remained an incomplete FSP objective …. The court recognized Mother's completion of parenting classes. However, she is still unable to effectively redirect the Children's inappropriate behavior ….
>
> From the beginning of this case, when the Children were placed in foster care, Mother has failed and refused to remedy the causes that brought [the] Children into care. Mother has refused to comply with drug and alcohol treatment and mental health services. Mother's overall parenting history and current circumstances dictates that she would be unable to provide the essential parental care, control, and subsistence necessary for [the] Children's physical and mental well-being.

Trial Court Opinion, 10/24/14, at 8-9 (citations to record omitted).

The testimonial evidence supports the trial court's findings. Cynthia Rogers-Robinson, the DHS caseworker for this family from July of 2011, to July of 2013, testified that the only FSP objective Mother satisfied while she was the caseworker was her parenting class objective and attending supervised visitation. N.T., 6/12/14, at 21, 26-30. Similarly, Mia Hill, the DHS supervisor for this family throughout the history of this case, and the assigned caseworker starting in July of 2013, testified that Mother did not comply with her FSP objectives. *Id.* at 49-50, 52-54. Hill testified that, as of the date of the termination hearing, Mother was minimally compliant with her FSP objectives. *Id.* at 55.

In addition, DHS introduced a progress report from the CEU dated June 5, 2014, indicating that, on January 15, 2014, Mother tested positive for cocaine and benzodiazepine. *Id.* at DHS Exhibit 2. Further, the CEU report stated, in part, that Mother "informed the CEU that she would self-admit into drug and alcohol treatment at the Wedge Recovery on 1/21/14. [Mother] was given an appointment to return to the CEU to provide documentation of her engagement in treatment on 1/24/14. [Mother] was a no call/no show to her scheduled appointment on 1/24/14." *Id.* The CEU had no further contact with Mother since that time. *Id.*

Kelly Casper, the CCTC therapist, testified that all of the Children except B.R. participate in one-on-one services at the CCTC that involves helping them process traumatic experiences they have suffered. *Id.* at 80-81. Casper explained that the treatment provided at the CCTC involves caregiver/parental involvement in some sessions.[6] *Id.* at 81. She testified

_____

[6] Ms. Casper testified on direct examination as follows.

> Q. So you mentioned caregiver sessions, what is entailed in that – caregiver or parent session?
>
> A. So part of a child's treatment at CCTC consists of parental involvement for various reasons, but typically [parents] first meet with a therapist before doing any sessions with the children for special education about trauma, about trauma symptoms, to talk about the children's history, their involvement in the children's history with the goal of them eventually participating in sessions to support the

*(Footnote Continued Next Page)*

that out of eight parent sessions offered, Mother attended two. *Id.* at 83. Based on the foregoing testimonial and documentary evidence, we conclude that Mother's claim that she has completed her FSP objectives is without merit.

We next address Mother's assertion that she "has shown continued positive intent in establishing a home for her and her children." Mother's Brief at 12. Hill testified that, at the time of the hearing, Mother was living with the Children's maternal grandmother. N.T., 6/12/14, at 51. Hill explained that the maternal grandmother's home is not appropriate for the Children because the Children lived there at the beginning of the case and were removed, and because there is not enough space in the house for the whole family. *Id.*

Based on the foregoing testimonial and documentary evidence, we discern no abuse of discretion by the trial court in concluding that Mother's

*(Footnote Continued)* ───────────

> child in their [sic] trauma recovery, whether that's apology work or you know, acknowledging what happens, supporting the child.
>
> Q. So these … initial parent sessions, why are these important? Are they important, and if so, why?
>
> A. Yeah, they're very important because children need to know, you know, understand that their parents have to take responsibility for what happened to them. It's not their fault, so they have support in their recovery.

N.T., 6/12/14, at 81-82.

- 17 -

conduct warrants the involuntary termination of her parental rights pursuant to Section 2511(a)(2). Indeed, the repeated and continued incapacity, neglect, and refusal of Mother to comply with her FSP objectives has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, the causes of Mother's incapacity, neglect, and refusal cannot or will not be remedied in that the Children had been dependent since November of 2011, and in placement since January of 2012. By the time of the termination hearing, Mother continued to struggle with her drug addiction and was minimally compliant with her FSP objectives.

Mother raises her fifth, sixth, and seventh issues in the context of her argument regarding Section 2511(a)(2), as follows.

> It appears that DHS did not make[] reasonable efforts towards reunification, by not helping [ ] [M]other, when replacement of her housing became an issue and did not assess her housing[] when she did obtain it, and by either failing and/or refusing to arrange for regular visits and/or contact with [ ] [M]other or to consider members of her family as resources or to place the children in the custody of members of her family, or by failing to consider temporary legal custody or permanent legal custody of the children with [M]other's family or resources and did not recognize her efforts in trying to address her mental health and drug/alcohol issues, which DHS did not recognize in a timely manner.

Mother's Brief at 12.

To the extent Mother asserts that her conduct does not warrant termination pursuant to Section 2511(a)(2) because DHS failed to make

"reasonable efforts" in the manner described, we reject her assertion based on our Supreme Court's recent decision in *In re D.C.D.*, 105 A.3d 662 (Pa. 2014). The *D.C.D.* Court held that neither Section 2511(a)(2) nor Section 2511(b) "requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *Id.* at 672. Therefore, Mother's second, fifth, sixth, and seventh issues on appeal fail.[7]

In Mother's eighth and final issue, she argues that the trial court erred in terminating her parental rights pursuant to Section 2511(b) because the Children have a bond with her. Our Supreme Court has explained that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted).

In considering the affection a child may have for his or her natural parents, this Court has stated the following.

> [C]oncluding a child has a beneficial bond with a
> parent simply because the child harbors affection for
> the parent is not only dangerous, it is logically

---

[7] Based on our conclusion that the trial court did not abuse its discretion pursuant to Section 2511(a)(2), we need not address Mother's first, third, and fourth issues, as they involve Section 2511(a)(1), (5), and (8). *See* *B.L.W.*, *supra*.

unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent .... Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in and of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015), *quoting*

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Mother argues that the evidence was insufficient to support involuntary termination, in part, because there was no formal bonding evaluation. Mother's Brief at 13-14. We disagree. It is well-settled that trial courts are not required by statute or precedent to order that a formal

bonding evaluation be performed by an expert. *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

In addition, Mother argues the evidence was insufficient to support involuntary termination based on the testimony of the CCTC therapists. The trial court, however, found as follows.

> The record established that the Children have special needs. One is autistic, while others suffer from post-traumatic-psychological issues due to parent's [sic] domestic violence. After twenty-eight months, the Children need a stable home with strong and continuous parental ties that would support their physical and emotional needs. The trial court determined that Mother was offered reasonable services by DHS, but after twenty-eight months has had little success in implementing what she has learned. She is unable to provide the level of protection, security and support for the Children['']s on-going emotional needs.
>
> …
>
> The Children will not suffer any irreparable harm by terminating Mother's parental rights. Separation from their Mother is a loss for the Children; however, with therapy they can overcome such a loss …. It is in the best interest of the Children to be adopted. Although there is a bond between Mother and [the] Children, it is not a parent/child bond. There will be no irreparable harm to the Children if that bond is severed.

Trial Court Opinion, 10/24/14, 9-10, 11-12 (citations to record omitted). The testimonial evidence supports the trial court's findings.

Casper, as the CCTC therapist for K.R., Jr., who was nearly age ten at the time of the hearing, testified that, upon the commencement of services,

- 21 -

K.R., Jr., presented with "[a]nger, defiance, disrespectful behavior, urinating, defecating in inappropriate places, excessive hand washing, excessive tooth brushing, worrying about the health of his family members[.]" N.T., 6/12/14, at 93. Casper testified that now K.R., Jr.'s, "main issue that we're just still working on is some of his anger, but he really is doing a really great job. There's occasional aggressive behavior with … his siblings, but overall, [K.R., Jr.,] as I said is doing really well. He's doing great in school." *Id.* at 94.

Casper testified that K.R., Jr., loves his parents. *Id.* at 87. Specifically, on direct examination, Casper testified as follows.

> Q. If rights were to be terminated, do you know how that may affect [K.R., Jr.]?
>
> A. Of course, I can't predict what will or won't happen. It definitely will be a loss for him as with any child whose [sic] … been always with their parents. You know, however, as I said before, what children, especially children who've been through trauma, really need is to be in a safe environment with caregivers that support them and believe them and can be there for their physical needs, emotional needs.
>
> Q. And … was [K.R., Jr.,] in that type of environment when he was in the home of his parents?
>
> A. As with what has been reported to me, no.
>
> Q. [ ] And as far as you're concerned, … has anything changed with the parents since the time the [C]hildren have come into care?
>
> A. They haven't demonstrated any capacity, no.

…

> Q. [ ] [I]f rights were to be terminated, you mentioned that that will be a los[s] to [K.R., Jr.]. Was that something … your agency would continue to work through if need[ed] in therapy?
>
> A. Definitely, that would be something that would process with all the [C]hildren.

*Id.* at 87-88. Importantly, Casper testified that K.R., Jr., has a bond with his foster parents. *Id.* at 88.

Mary Abboud, the CCTC therapist for the twins, M.R. and E.R., who were age eight at the time of the hearing, and H.R., who was age six at the time of the hearing, testified that these three children "are all really happy in the care of [their foster parents]." *Id.* at 96. Abboud testified as follows on direct examination.

> Q. [ ] Now, the question of if [parental] rights were to be terminated for those three children, how would that affect them, if you can say?
>
> A. I mean I would agree with Ms. Casper. It would be a loss, but not something that they would not be able to work through in therapy. At this point, their biological parents haven't demonstrated the capacity to validate the children's trauma history or support their on-going emotional needs.

*Id.* at 98.

With respect to the trauma suffered by the Children, Abboud testified that E.R. and M.R. disclosed as follows during therapy sessions.

> [E.R. has] talked at length about the domestic violence [between] Mom and Dad ….

- 23 -

> She and [M.R.] have talked about having to use a bucket as a bathroom, possibly placed in the car when the toilet wasn't working. They've talked about sleeping on the floor because they didn't have beds. They've talked about not having clean clothes and how great it is now that that they have clean clothes.

*Id.* at 96.

Abboud testified that E.R., M.R., and H.R. suffered from anxiety when they came into care. *Id.* at 97. She further testified that E.R. is "really concerned about her Mom's health and well-being." *Id.* at 98. She explained, "we've done a lot of psycho-education with the kids about, you know, the impact of trauma and how it often works out that when kids aren't properly cared for, they end up taking a sort of a parentified role. So we've worked really hard with the kids around that …." *Id.* at 97-98.

Erica Zucker, the CCTC therapist for K.N.R., the oldest child who was age 12 at the time of the hearing, testified that K.N.R. initially presented as being "withdrawn, emotionally isolated, really guarded about discussing anything related to being in her mother's home … guarded about talking about any of the traumas. She was having some nightmares, overeating." *Id.* at 100. Ms. Zucker testified that K.N.R. "has improved a lot. She's making friends at school. She seems more open to talking in therapy in general, but also discussing the trauma history, acknowledging it." *Id.* at 101.

With respect to whether the termination of parental rights would affect K.N.R., Zucker testified, "I agree with my colleagues that it would be a significant loss for her.  It will be hard, but she can work through it in therapy and being in a supportive home.  In a safe home, I think she could certainly do well." *Id.* at 101.

Additionally, the trial court inquired of the CCTC therapists as follows.

> THE COURT: [ ] As to … all three therapists, as to each individual child – and Ms. Abboud the three children that you have seen, would you say there would be any irreparable harm to the children if their parents['] rights were terminated?
>
> MS. ABBOUD: Typically, Your Honor, with all due respect, we can't characterize; nobody in this room can.  As we stated repeatedly, we think that with the right amount of support and a caregiver that's going to be able to support the children around their trauma recovery, validate the trauma history, and support their physical and emotional needs, we think that they would be able to recover from the los[s] of the termination.

*Id.* at 102-103.

With respect to B.R., the second oldest child who is autistic and was age 11 at the time of the hearing, Vernon Price, the foster care agency caseworker, testified that B.R. was referred by the Center for Autism for therapy at Child Guidance.  *Id.* at 104.  He testified as follows on direct examination.

> Q. If rights were to be terminated for the parents, do you know if that would have any irreparable harm on her?

A. I have to echo Ms. [Abboud], you know, it's difficult to predict, but it would definitely have a significant impact, yes. Would she be able to recover? Very possible with the right support system, you know. It would have to be a strong support system.

Q. Do you believe she has that support system now?

A. I would have to say, yeah. Yeah. And with some supports we could put in place moving forward.

*Id.* at 105.

Based on the foregoing testimonial evidence, which we have reviewed in accordance with the relevant statutory and case law, we conclude that the trial court did not abuse its discretion in involuntarily terminating Mother's parental rights pursuant to Section 2511(b).[8] Accordingly, we affirm the decrees pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed. Orders affirmed.

_____

[8] To the extent Mother argues that the trial court erred in terminating her parental rights pursuant to Section 2511(b) because "[t]he [C]hildren's wishes were not sought," we disagree. Mother's Brief at 13. In *In re B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001), we explained that, "the preference of the child, reviewable in a custody proceeding, and his right to be heard on the record, is not relevant to termination proceedings, as the child is not electing a choice between two otherwise fit parents with whom he will be able to be placed." *Id.* at 1014.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/22/2015</u>